### EXCHANGE NAT. BANK *v.* JOHNSON and others.

*(Circuit Court, W. D. Tennessee. March 15, 1887.)*

1. **PROMISSORY NOTES—PAYMENT TO ORIGINAL HOLDER AFTER ASSIGNMENT FOR VALUE—REPAYMENT—AGENCY FOR COLLECTION.**

   If the indorsee constitute the indorser or original holder his agent, by relying on him to collect of the maker, taking himself no steps for that purpose until after the failure of the indorser, payment to the original holder will be good.

2. **SAME—INDORSER PAYING THE NOTE.**

   If a bank accept the note of the indorser in discharge of his liability as indorser, the title to the first note reverts to the indorser, and payment to him is good, although the indorser leave the note on deposit with the bank; but it is a question for the jury to determine whether, on the facts of the case, the new note be taken in discharge of the indorser's liability, or as a mere memorandum note, not intended to affect the title to the old note.

3. **SAME—ESTOPPEL.**

   If the maker pay other than the rightful owner of the note, he cannot rely on facts unknown to him, and not influencing his action, as an estoppel, but if the facts be of a character that establish an agency for collection, that is a defense against repayment.

At Law    Motion for new trial.

Suit upon a negotiable note made by the defendants to their factors, and paid to them by shipments of produce as agreed upon, but while

the note was held by the plaintiff bank, by a transfer under circumstances stated in the opinion of the court.

*McCorry & Bond*, for plaintiff.

*Pitts & Hays* and *Mr. Meeks*, for defendants.

HAMMOND, J. The verdict in this case for the defendants is well supported by the proof upon at least one ground not at all affected by the objections taken on this motion for a new trial to the charge of the court. I do not see how the jury could escape finding that Ferry, Davis & Co. were the agents of the plaintiff bank for the collection of the note, be its ownership or interest whatever it may have been. The statement of the principal clerk and the president, that they were not agents for collection, and were never authorized, is utterly worthless, being merely their opinions or conclusions upon that issue of fact, and not their testimony as to the existence of certain substantive circumstances and transactions from which the issue might be determined by the jury, whose province it was to draw the proper inference of fact as to the agency from the circumstances, and not from the opinions of the witnesses. They might affirm, certainly, that there had never been any formal appointment of the firm as agents for that purpose, but when they are asked, "What authority had Ferry, Davis & Co. at any time to collect said note?" and they answer, "They had no authority," or, "They had no authority whatever, verbal or written,"—the testimony can go no further than such an affirmation, and is entitled to no weight beyond that.

Out of the well-known facts of the case the agency is established, notwithstanding these opinions to the contrary, and on the cross-examination of the president it is substantially admitted. Being asked why the bank did not for nearly two years take any step towards the collection of this note, and others of similar character "discounted" for Ferry, Davis & Co., he replied: "Up to the time of their failure they were profuse in their promises and statements that the parties whose notes were held were going to make them shipments of cotton and peanuts to cover their indebtedness, and that they would promptly sell and take up the notes. After their failure, and as soon as we were able to get their books and accounts, we immediately, through our attorneys, commenced proceedings to enforce the collection of these notes and accounts." And subsequently, referring to this answer, he was asked if he was not willing and anxious that that should be done; to which he replied, "Yes." This was an agency abundantly sufficient to justify the makers in paying the note to Ferry, Davis & Co., and the facts show that the bank never for an instant contemplated payment in any other way until, after the failure of Ferry, Davis & Co., this somewhat discreditable attempt to compel the makers to pay it a second time was conceived. It is, considering the circumstances, taking an unfair advantage of the equivocal situation in which the makers were placed, and of which they never had any knowledge.

Counsel for the defendants sought to raise an estoppel here, and asked a charge to that effect, which was refused, because the defendants did

not know anything of the facts,—did not even know that the bank held the note, and of course did not, in making the payments, act upon, or rely in the least upon, the circumstances sought to be used to invoke the doctrine of estoppel. As the court told the jury, the defendants acted most recklessly, and in their own wrong, to pay the note to the original payees without demanding its production, or satisfying themselves that it had not been transferred to some one else having alone the right to collect it; and, under the commercial law, there could be neither sympathy with them, nor relief for them, if they found afterwards that some other holder was entitled to the payment. Yet there could be no doubt of their right to meet this demand by the bank for repayment by showing that the payments they had already made to the original holder were authorized by the bank itself, as they undoubtedly were. The truth is, it is somewhat a misnomer to call the transaction a "discount" of the note by the bank. It took that form, undoubtedly, and so entered into the book-keeping processes as a "discount," but, in substance and fact, it was the transfer of the note, either in payment of, or as collateral security for, a pre-existing indebtedness to the bank. It is wholly immaterial which it was, since there was, in either case, an agreement between the original holder making the transfer and the bank that the original holder, and not the bank, would collect the note, and apply the proceeds to the payment of the note itself, or to the indebtedness secured.

Counsel for the plaintiff seem correctly to guage the transaction when they argue that it was not a pledge, either in payment of or as collateral for any particular debt, but only a pledge to secure "a line of credit" for the depositors' account with the bank; the object being to place the title in the bank as a security for whatever should be due on the depositors' account, either in the shape of notes, indorsements, or overchecks, though the bank, as usual in such cases, goes through the forms of "discount," deposits, "memorandum," or "call" notes, renewals, and the like, with the evident convenience of thereby saving its tolls due for interest, discount, charges, etc., and preserving its usual style of book-keeping. Neither can it be denied that the bank is as much under the protection of the commercial law with regard to such paper as if the transaction were in both form and substance what it seems to be in form. Nevertheless, be its holding what it may, if the bank delegates to its customer the power and duty of making collections for it, and receiving payment of the note, it cannot dispute the validity of such payments if its customer become unfaithful, and does not pay over the collections.

If anything more than the confession of the president of the bank, already adverted to, be needed to support this finding by the jury, let it be remembered that the makers were country merchants, residing in a small village on the Tennessee river, remotely situated from railroads and the centers of commerce; that they were dealers in produce, and Ferry, Davis & Co. were their factors; that it was the intention of both parties to have the note paid by shipments of produce to that firm, and not, after the manner of banks, in money at the counter of the bank,

although it is in terms payable at another than the plaintiff bank; that the plaintiff did not at maturity demand payment, either at the bank where the note was payable on its face, or of the makers; neither did the plaintiff, when the note was about to mature, give any notice that it held the note, as was the usual course of business with ordinary paper to be collected by the bank, either on its own account or for customers; nor did the plaintiff give any notice or demand any payment at any time after maturity, but silently held the note for nearly two years from August 4, 1883, the date of its "discount," until after the failure of Ferry, Davis & Co., on February 8, 1885, and then only put it out for collection in April, 1885. There is some little pretense in the testimony of the principal clerk that this indulgence was on account of short crops, and given as a favor to the makers; but this witness appears, on the face of the deposition, to say nothing of the confession of the president and the other proof,—to be quite unreliable in his statements; and the jury, no doubt, found the facts as stated above, and their judgment should be conclusive.

Now, I do not wish to be misunderstood here. It is conceded that the makers can find no sort of excuse in these circumstances to evade the rule of the commercial law that payment must be made to the assignee of the note for value before maturity, and without notice; that the bank was not bound to give notice of the transfer to it; that, as concerns the makers, it was not bound to demand payment, at maturity or afterwards, anywhere; that it might, during the whole period of the statute of limitations, silently hold the note without demanding payment, and that these indulgencies or want of notice could be no defense to the makers, paying, however ignorant they may have been of the situation, to any one else than the holder of the note. It was their business to assure themselves that the person to whom payments were made was the person entitled to receive payment. These facts and circumstances are not in that sense to be relied on as any defense to this action, but they are, under the peculiarities of this case, conclusive evidence of an agreement, express or implied, between the bank and its customer, that the latter should collect the note; whereby, fortunately for the defendants, the payments were authorized, even if the note did belong to the bank.

Nothing more is needed to sustain the verdict, but I think I should not set it aside if this feature were wanting. It is quite evenly balanced, on other facts, whether the note did belong to the bank or to Ferry, Davis & Co., and, perhaps, a verdict either way should not be set aside. Notwithstanding the appearances already noticed, the relation between Ferry, Davis & Co. and the bank, in regard to this and other "country paper" held by them, and "discounted" to the bank, might be, in fact, misunderstood by either, and perhaps was never very clearly and definitely determined at all by anything that was agreed between them upon the subject; and certainly nothing in proof here makes it clear what this relation was. There are abundant opinions of witnesses, but no precise facts that settle the controversy, and, as before remarked,

the inferences to be drawn from the known facts are about evenly balanced. When Ferry, Davis & Co., on the eighth day of February, 1884, executed their note for $1,996.10, payable *on demand* to the plaintiff bank, like many others previously and subsequently made, it was for the aggregate amount of three notes of their country customers, then long past due, and which had been held by the bank as the note of defendants here was held. These three notes were pinned to the demand note, and so remained in the bank until a year afterwards, when Ferry, Davis & Co. failed, and made an assignment, preferring the bank, after which the notes were sent to attorneys for collection. None of the witnesses testifies as to what was said between the parties at the time of this transaction, nor as to what was done by them, except as above stated. At that time the defendants here had paid to Ferry, Davis & Co. $234.86 on the note sued on, by shipments of cotton made subsequent to the transfer of the note to the bank, and this was credited upon the note, and the credit was acknowledged by the bank,—another circumstance to establish that agency for collection, on behalf of the bank, already considered. This credit was not entered on the note formally. It appears in figures of pencil, made in making calculations, and that is all. It was, however, deducted in fixing the amount of the demand note, and so was recognized by the bank as a proper credit. There is no proof that the money was paid to the bank, certainly not as a credit on the note; but, if at all, only by deposit to Ferry, Davis & Co.'s account, and this not of that particular collection, but as included in their general deposits. No other fact appears, so far as the conduct of the bank is concerned, but there is in the evidence the often-repeated assertion that the officers of the bank did not consider that its relation towards the note was affected by this transaction, but that the ownership continued precisely as it was before. Yet this seems somewhat inconsistent with the fact that the bank did not undertake to collect this or any of the country paper until after the insolvency assignment, nor until they had taken possession, as the president says, of the Ferry, Davis & Co. books and accounts, which would seem to imply that they looked to that assignment, and not the original "discount," as the source of title.

No suggestion is made in the proof that the three notes pinned to the demand note were held as collateral security for *that* note, nor for any other indebtedness particularly, nor for Ferry, Davis & Co.'s account generally. The theory of the officers is that the note was the bank's own property, having been "discounted." Therefore, in that view, the pinning of the three notes to the demand note had no significance of a pledge as collateral,—none whatever. Nothing can be implied in that direction. Going further back, what has already been said as to the so-called "discount" applies here. It was that in form, no doubt. The amount, less the charges, was put to Ferry, Davis & Co.'s deposit account as if so much cash had been deposited, but immediately a check was given for the precise amount, so that the deposit account stood exactly as it did before. This check was to pay the bank, in whole or in

part, some indebtedness due the bank, but what particular indebtedness is not disclosed. Doubtless it was to pay some previous demand note or other form of indebtedness; the clerk says perhaps to pay Ferry, Davis & Co.'s "straight paper," whatever that may mean,—"the bank preferring two names on business paper to Ferry, Davis & Co.'s own notes." From this and other testimony it may be inferred, notwithstanding the president says that Ferry, Davis & Co. were not in good credit with the bank, that Ferry, having been president himself, and being then a director, did have credit enough to get money without adequate security of any kind. But, after all, the transaction was the substitution of one debt for another,—the defendants' note, indorsed by Ferry, Davis & Co., for Ferry, Davis & Co.'s "straight paper;" and, as the sequel showed, it was at best only lending on Ferry, Davis & Co.'s sole credit, and a reliance upon their ability to take care of the indorsed paper; for otherwise the bank would have looked for itself to the collection of defendants' note. Ferry, Davis & Co., being authorized or expected to collect that note, and all other paper like it, were not expected, as Ferry says, to pay each and every collection on its own particular note, and have the credits entered thereon, but were to put their money on deposit as they should have it in hand to deposit, which they did. Disguise it as one may, by the forms assumed, it was in fact not the isolated purchase or "discount" of a note by the bank which now it is pretended to have been, but one of a mass of transactions through which this former president, and always director, of the bank, was permitted to have money on the strength of his own credit, secured by the deposit in the bank of his own business paper, which he himself was to continue to manage as if the deposit had not been made. The bank officers say the demand note was only a "memorandum note to keep the account alive," and was not intended to be taken in payment of the others, which is in keeping with the above suggestion as to the true state of the affair.

Ferry, Davis & Co. say they regarded the defendants' note and the others as regained by the "call note," as they term it, and afterwards as belonging exclusively to them. They charged it again to the defendants' account, and dealt with it as their own; but substantially they had done this before, and really their control was not any greater than it had been. The fact which is wholly inconsistent with their theory is that the note remained in and with the bank just as it had done. They explain this by saying it was there only as their own for safekeeping; but they state no fact showing that the bank agreed to so keep, it, or considered the transaction to be of that character. The truth is, I have no doubt, that, in their then condition, substantially all their paper was thus tied up in their bank, and they and the bank did not have any definite agreement about it. They did not ask to have the notes returned, as that would, possibly, have been refused; and having entire control of the debt due by defendants, and being themselves expected to collect it, they did not wish or need to press to conclusions any consideration of the question who was entitled to have the actual

possession of the paper. If defendants had called for the paper on making any payment, it would no doubt have been produced, and they would have been none the wiser, whether it belonged to one or the other. But remotely situated as they were, and it being the original intention to meet the note by shipments of produce from time to time, stern as the commercial law is, there is scarcely one business man in a thousand who could not have been caught in the same way. Ferry, Davis & Co. concealed the fact that the notes had been paid, and, perhaps, misled the bank in that regard, but this did not justify it in seeking repayment upon the theory that the payments had not been authorized.

It is very difficult to determine on this proof whether the transaction in reference to the demand note was as the bank claims, or as Ferry, Davis & Co. claim, but the jury might very well have inferred that it was a payment outright, and that the ownership of Ferry, Davis & Co. was restored. Those who would live by the sword of the commercial law must likewise perish by it. Unexplained, and looking at the form only of the transaction, as plaintiff would have us, as to the "discount" of this particular note of the defendants, the bank was the purchaser for value, before maturity, in due course of trade, with Ferry, Davis & Co. liable *upon their indorsement*, and not otherwise. The indorsers are called on to make good *that* liability, which they do, by giving this demand note. Now, if the indorser pay a note, *he* is entitled to possession, and *ipso facto* recovers the ownership, and may pursue the maker. For myself, if called on to decide the fact on the proof here, I should find that to have been precisely what, in legal contemplation, the parties did in this case, on their own theory of a "discount" of the note, although they might not have thought of or agreed upon that as the technical bearing of the transaction, and certainly I should not disturb the verdict of a jury to that effect.

But, suppose that inference be wrong, then the only other possible one, on the technicalities of the law, would be that Ferry, Davis & Co., in settlement of their liability *as indorsers*, gave their own note; and, thus having recovered the ownership and possession of defendants' note, this they simultaneously pledged as collateral security for their own. But it was then long past due, and hence was *not* transferred before maturity, and is open for whatever defense may be available under these circumstances; and that of the pledgeor's agency to collect for the pledgee is still good, whether any other be or not. I cannot comprehend how the bank can ignore every circumstance connected with their dealings with Ferry, Davis & Co., except the original "discount," set up the relation to the defendants growing out of *that* circumstance, and maintain it; nor, if they set up that relation as the basis of title, how they can consistently claim to be holders of the note *as collateral* security, and maintain that also. They did not, in my judgment, when probed to the bottom, hold in either relation, *strictly* speaking. It was a delusion all the way through. The bank held the "country paper" of their customer in substance as a general security for advances, and to protect all balances that might be-

come due; but it did not, *in fact*, rely upon it, or use it for that purpose, —any more than it did when the transaction is looked at as a simple "discount" of isolated paper or as a collateral pledge for a particular debt, —by looking to its collection, and to the appropriation of the proceeds to the debts due by the customer, as it should have done, but left all that, *unsecured*, to the good faith and credit of the favored customer, looking *alone* to *him* for payment. And, the customer having failed, it takes a general assignment of all notes and accounts, with other assets, believing this note and others to be unpaid, but being disappointed in that belief it now attempts to claim through the original "discount." If the defendants had known all this, the bank would have been *estopped*, no doubt; but they did not, and can only rely on their other defenses. But they have surely the right to scrutinize the bank's dealings with Ferry, Davis & Co., and to set up form against form, technicality against technicality, and delusion against delusion, in the dealings of the bank with the customer. Thus, they compel the bank to elect its position. It does that, and chooses to treat its title as arising out of the original "discount" of an isolated note. So treated, aside from the agency to collect, which is good on every ground, there is a form of payment by the indorser, and positive proof that it was intended to have that effect; whereupon the bank denies that this form is the correct state of the affair, and relies upon some undefined outside intention to save it from that consequence. It alleges that the demand note was only "a memorandum" for the purpose "of keeping the account alive;" which means, I suppose, that the appearance of having past-due paper or unbalanced overchecks must be avoided. But it must be apparent that this mode of dealing was liable to delude the indorser, and the makers of the hypothecated or "discounted" notes, and comes very close to an estoppel in dealing with them. And, as on the issue of an agency for collection, these circumstances may be looked to by the jury as evidence in support of Ferry, Davis & Co.'s testimony that it was in fact a payment of their liability as indorsers, and "a taking up of the note" by them, rather than the "memorandum" theory to which the bank officers testify.

In view of all that has been said, it is now plain that the criticism of the charge of the court is unavailing. No exception is or could be taken to the instructions on the subject of an agency for collection; and, that fact being supported by the proof, the defense is complete without more. But I do not wish to rest under the imputation of having repudiated *Gosling* v. *Griffin*,[1] (MSS., Sup. Ct. Tenn., Jackson, 1875,) 3 S. W. Rep. 642. That case has become a leading one, and has been frequently followed and cited. It is unfortunate that, in the blockade attending the official reporting of those times, it has never been reported. It is digested in 1 Meigs, Dig. (2d Ed.) 335, approved in *Richardson* v. *Rice*, itself not officially reported but appearing in 7 Cent. Law J. 225, and is cited in *Sawyer* v. *Moran*, 3 Tenn. Ch. 35, and in 1 Daniel, Neg. Inst. (3d Ed.) § 830. I was of counsel on the winning side, and our Brother JACKSON,

---

[1] See note at end of case.

now the circuit judge of this circuit, but then in the supreme court, delivered the opinion. I read it carefully from the opinion book before charging the jury in this case, and did not intend to depart from it. It properly overrules *Vatterlien* v. *Howell*, 5 Sneed, 441, and if I charged the jury, as counsel state in their brief on this motion, that, after the pledge of the note as collateral to the demand note, it was necessary that the bank should give notice of its holding to the maker in order to protect itself against payments, the collateral note being then past due, I did commit an unintentional error, but not one for which a new trial should be granted, for the reason already stated. I did not reduce the charge to writing, as I often do, to avoid mistakes, but the brief notes from which it was delivered support my own memory that counsel are perhaps mistaken. On that point I have this note: "Collateral to new note: Must give notice if transferred after due as collateral, of changed relations." By this it was meant that the jury should be told that, if the bank had at the time of the original "discount" appointed Ferry, Davis . & Co. as its agent for collection, and ratified collections made by them at the time the demand note was given, and afterwards there was a change of this agency relation, the defendants should have been notified of the revocation of the agency. I have the defendants' request for instructions on the defense of estoppel, which was refused, and the intention was to confine the jury to the two points of agency and a recovery of ownership by the substitution of the demand note. I stated repeatedly during the argument that *Gosling* v. *Griffin* was approved, but that it did not apply to the facts of this case. The defendants did not deny *Gosling* v. *Griffin*, and so, on the whole, I am inclined to think I did not charge as stated. Nevertheless, I should grant a new trial on the doubt about it, as I may have been careless on a point not deemed of much importance, but for the fact that the case almost justified a direction of a verdict on the defense of an agency to collect, which I came very near giving. I cannot think that the jury was misled from that point in the case by any error on the other point.

Overrule the motion.

---

[NOTE. The following is the opinion in *Gosling* v. *Griffin*, referred to above, which is also now reported in 3 S. W. Rep. 642:]

JACKSON, Special Judge. The material facts of this case necessary to be noticed in determining the legal question presented by the record are the following: On the ninth day of January, 1872, the defendant, T. S. Griffin, executed and delivered to Pollard & Co. his negotiable promissory note for the sum of $598, payable 30 days after date; the consideration for said note being the proceeds of a buggy which Pollard & Co. had placed in said Griffin's hands for sale, and which he had sold, and used and appropriated the money. The payees in said note being indebted to plaintiff, Gosling, in the sum of $554.25, evidenced by his acceptance, which matured third January, 1871, and which had been placed in the hands of attorneys at Memphis for collection, on the tenth day of January, 1871, indorsed in blank the defendant's said note for $598, and delivered it to the plaintiff's attorneys as collateral security for

the indorser's acceptance, which said attorneys held for collection. Said attorneys, at the time of receiving defendant's note from said Pollard & Co., gave to the latter a receipt specifying that said note was received by them as collateral security for the payment of said Pollard & Co.'s acceptance for $554.25, due third January, 1871. It appears that the defendant, after the date of this transfer, and before the maturity of his said note, delivered to Pollard & Co. several lots of flour and meal in payment and satisfaction of his note. This flour and meal, to the amount of $613, was delivered on the twenty-fifth, twenty-sixth, twenty-ninth, and thirtieth of January, 1871, without notice or knowledge on the part of defendant that his note had been previously indorsed and transferred by Pollard & Co. to the plaintiff. He accordingly refused to pay the note at its maturity, and was sued thereon by the plaintiff in first circuit court of Shelby county.

Among other pleas not necessary to be noticed, the defendant plead that said note was not transferred to the plaintiff in due course of trade, but was given to the plaintiff by the firm of Pollard & Co., as collateral security for a debt which the said Pollard & Co. owed the plaintiff; and, further, that the defendant paid said note to the firm of Pollard & Co. without notice from the plaintiff that he had the note assigned to him, and of this he put himself upon the country.

By consent of parties, a jury was waived, and the case was tried by the court, and resulted in a finding "that, though the note was assigned before maturity, it being received as collateral to secure a pre-existing debt, the defendant should have been notified of the assignment, and the plaintiff cannot recover on the note because defendant was not so notified before paying the note to Pollard & Co. Court thereupon gave judgment for the defendant, from which the plaintiff has appealed in error to this court.

In rendering judgment for the defendant upon the foregoing facts, the court below followed the case of *Vatterlien* v. *Howell*, 5 Sneed, 441, which presented the direct question here presented, and is conclusive of the present case, if it is to be adhered to as authority. In *Vatterlien* v. *Howell* the material facts were that Howell & Co., on the tenth March, 1856, executed to F. S. Brown & Co. their promissory note for $208.50, due at six months. On the fifteenth day of May, 1856, Brown & Co., the payees, indorsed and delivered said note to Vatterlien as collateral security for the payment of a pre-existing debt due from them to him. Vatterlien gave the makers no notice of this assignment of the note to him, and on the thirtieth July, 1856, before the note matured, the maker paid the amount thereof to Brown & Co., the payees. When the note was due, Vatterlien sued the makers, and it was held that this payment to the payees before maturity, and after the assignment of the note, having been made without notice of the transfer, was a good defense against the suit of said Vatterlien. This decision seems to proceed upon the idea that an indorsee of negotiable paper, who receives it before maturity as collateral security for or in payment of an antecedent debt, is bound to *notify* the *maker* of his being the holder, in order to protect himself against payments by the maker to the original holder or payee; that, in the *absence* of such *notice*, an indorsee must show himself to be a holder for value, and in due course of trade, in order not to be bound by the maker's payment to the original payee, although made before maturity, and after transfer of the note. We cannot assent to the correctness of this principle, as applied to *negotiable paper*. It, in effect, places *such* paper upon *precisely* the same footing as open accounts, and, in our opinion, attaches a condition to the legal and complete transfer of negotiable instruments, which is supported neither upon principle nor authority.

It was decided in *Clodfelter* v. *Cox*, 1 Sneed, 330, that the assignee of equitable rights and open accounts must give notice to the debtor or holder of the fund of the assignment, in order to protect himself against subsequent

payments by the debtor to the assignor. But in the subsequent cases of *Mutual Protection Ins. Co.* v. *Hamilton*, 5 Sneed, 277, and *Sugg* v. *Powell*, 1 Head, 221, it was held that this doctrine as to notice had no application to the asignment of *negotiable paper*, or of instruments which, though not negotiable by the law-merchant, are made assignable by law, so as to pass the legal interest or title, and permit the assignee to sue in his own name.

The rule announced in these cases is irreconcilable with the position assumed in *Vatterlien* v. *Howell*. No authority is cited to sustain the proposition or conclusion of law laid down in *Vatterlien* v. *Howell*, except the case of *Van Wyck* v. *Norvell*, 2 Humph. 192, which fails to support the decision. The contest in *Van Wyck* v. *Norvell* was between the *true* owner of the notes and a party holding them as *collateral security*. The former prevailed upon principles well settled in our decisions; but Judge GREEN, who delivered that opinion, recognized the fact that a pre-existing debt was a good consideration, as between the holder and the individual from whom he received the paper, though it would not be sufficient to entitle him to hold against the true owner. The consideration on which Vatterlien received the transfer of the note from Brown & Co. being a good one, as between *themselves*, and that transfer having vested him with the legal title to the note so as to dispense with the necessity of his giving notice of the assignment, the conclusion seems to be inevitable that a payment by the makers to the original payee, after such transfer, and before maturity, should not be held good against the holder.

Again, the decision in *Vatterlien* v. *Howell* ignores the distinction that should manifestly be taken between the payment of a *negotiable note* made after its transfer and such a payment *before* assignment. The latter is the proposition discussed by the judge delivering that opinion. He says: "The argument is that, if a party pay a negotiable paper (as this is) before maturity, and fails to take it up, he does it at his peril, and if it is *afterwards* assigned before maturity, the assignee has the right to enforce its repayment." After correctly saying that this doctrine was too broadly stated, the opinion proceeds: "It is true that if a party pay a negotiable paper before due, and fail to take it up, and it is *afterwards*, and before maturity, negotiated in *due course of trade*, the assignee, being an innocent holder for a valuable consideration, would be entitled to enforce its payment. But it is equally true that, if it is taken in payment of, or as collateral security for, a *pre-existing* debt, it is not negotiated in due course of trade, and the holder would stand in no better situation than the payee, and would be subject to all defenses which might be made against it in the hands of the payee." This was undoubtedly a correct statement of the law as applicable to the case of payment of negotiable paper made *before* its transfer or assignment. But it did not follow from this principle, as the court concluded therefrom, that a *payment* made after such transfer or assignment would stand upon the same footing and be equally available as a defense to an action by the holder. The indorsement and delivering of negotiable paper as collateral security for pre-existing indebtedness is a transaction of daily occurrence in all commercial communities. It is a legitimate use of such paper, and, if the person so receiving it does not become thereby a holder for value and in due course of trade, according to the law-merchant, so as to cut off all defenses, he is certainly entitled to protection, as against payments made or equities arising between the maker and indorser *after* the date of such transfer.

The business of mercantile communities is to a great extent transacted through the medium of bills of exchange and promissory notes; and this free circulation of such paper is a matter of too much importance to be restricted by adhering to an adjudication not founded upon principle, nor supported by authority. Our decisions have gone sufficiently far in holding that negotiable paper, transferred in payment of a pre-existing debt, or as collateral security, is subject to all equities or defenses existing against the paper at

the time of its transfer, and we are unwilling to extend the principles of these decisions so as to let in *defenses* arising *after* such transfer. Every maker of negotiable paper knows, as a matter law, that it is transferable, by indorsement, so as to pass the legal and complete title to the paper, and the debt evidenced thereby, and it is his duty to pay to the holder upon production of the note. Payments of negotiable paper before it is due, and in the absence of such paper, are not made in the due course of business, and the party so paying should be held to do so at his own risk; for, when the title has passed by indorsement and delivery of such paper, the actual holder alone has the right to receive the money due thereon, and the maker, in paying to the original payee after such transfer, in the absence of the paper, either before or after its maturity, must abide the consequences of making payment to a party not entitled to receive it.

Our legislature, in providing indemnity for makers of lost negotiable paper when sued thereon, proceeds upon the principle that the actual legal holder thereof could lawfully compel a repayment to himself. We therefore hold that, in the case of negotiable paper, the maker is not discharged if, before the maturity of the paper, and after its transfer, even as collateral security, he makes payment to any person other than the *real holder*. This conclusion is fortified by the rule applicable to overdue negotiable paper. When such paper is indorsed and transferred *after* maturity, the maker can avail himself only of such matters of defense as existed between himself and the promisee or indorser at the time of the actual indorsement and transfer of the note to the holder. This is so both upon the principles of the law-merchant, and under the provisions of our statutes of set-off. It is founded upon the well-settled rule that a note does not cease to be negotiable because it is overdue. The payee, by his indorsement, may still communicate a good title to the indorsee, nor can the maker, when sued thereon, rely on matters of defense against the indorser which arose after such transfer, although he had no notice of the transfer at the time of acquiring his defense. The maker has no right to presume that such overdue paper, which he has made negotiable, and on which he agrees to be liable to the actual holder or indorsee, remains in the hands of the original payee; and if he pays to the original promisee, without requiring the production of the paper, he does it at his own risk. This is the true distinction between the assignment of open accounts or equitable interest in a fund and the indorsement of a negotiable note.

In the former case notice of the assignment must be given the debtor to protect the assignee against future payments to the assignor. Such assignee acquires only an equitable title, and, in the absence of such notice, the debtor may reasonably presume that the original creditor still holds or controls the claim, and may accordingly make payments to him in the ordinary course of business. But the indorsee of an overdue negotiable note acquires a full legal title, with the sole and exclusive right to demand and receive payment thereof. His rights being *only* subject to the equities and defenses existing against the paper *at the time* of its transfer to him, no defenses against the original payee acquired after the transfer are available against him.

Now, it is manifest that negotiable paper, taken as collateral security for pre-existing indebtedness *before maturity*, and before any equities or defenses exist against it, must stand upon the same footing as the transfer of such overdue paper. The holder in neither case is considered a holder for value in due course of trade, under the law-merchant. Both are subject to all equities existing *at the time* of the transfer, but neither is subject to *defenses* arising after such transfer.

The foregoing doctrines are, we think, supported both by principle and authority. See *Carr* v. *Lewis*, 20 N. Y. 138; *Wheeler* v. *Guild*, 20 Pick. 545; *Baxter* v. *Little*, 6 Metc. 7; Edw. Bills & N. marg. 537, 538.

Our conclusion is that the case of *Vatterlien* v. *Howell*, 5 Sneed, 441, was not correctly decided, and should not be adhered to as authority.

It follows from the principles already announced that the defendant's payment to Pollard & Co., the original payee of the note sued on, made *before* its maturity, but *after* the date of its indorsement and transfer to the plaintiff as collateral security, constitutes no valid defense to the plaintiff's suit upon said note, although the defendant may have had no notice of such transfer at the time of making such payment. It results, therefore, that the judgment of the circuit court must be reversed, and that the plaintiff have judgment here upon the note, with cost of suit.

